*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NANCY BURKHARDT and NANCY BURKETT,

        Plaintiffs-Appellants,

v

FLINT COMMUNITY SCHOOLS, FLINT BOARD
OF EDUCATION, and SCHOOL DISTRICT FOR
THE CITY OF FLINT,

        Defendants-Appellees.

UNPUBLISHED
March 24, 2020

No. 347319
Genesee Circuit Court
LC No. 17-109313-CZ

Before: O'BRIEN, P.J., and JANSEN and GLEICHER, JJ.

PER CURIAM.

In this employment discrimination case, plaintiffs, Nancy Burkhardt and Nancy Burkett, appeal as of right the trial court's order granting defendants' motion for summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact). We affirm.

## I. BACKGROUND

Plaintiffs began working at Mott High School (Mott) in September 1990. Mott teachers and K-12 teachers at the other schools within the School District for the City of Flint (the District) were members of the United Teachers of Flint, Inc. (the Union) and subject to the same collective-bargaining agreement (CBA). Mott teachers, however, were on a different pay schedule than K-12 teachers. Also, Mott teachers were paid hourly, while K-12 teachers were salaried, and Mott teachers' annual pay was significantly less than K-12 teachers' annual salaries. The Mott pay schedule and the K-12 pay schedule designated various "step" increases based on years of service, and "lane" or "level" increases based on the extent of graduate education. In 2014, Mott closed. Following the closure, plaintiffs transferred to Northwestern High School (Northwestern), which was part of the District. Plaintiffs taught English at Mott and continued to do so at Northwestern.

Before the transfer went into effect, the District and the Union negotiated a new CBA. That CBA included a pay schedule for K-12 teachers, but it did not explain how the transitioning Mott teachers would be placed onto the K-12 pay schedule. The Union and the District worked together to resolve this problem. On September 19, 2014, Dr. Jessie Kilgore, on behalf of the District, sent

-1-

an email explaining that the transitioning Mott teachers could be treated as new teachers under the CBA, and that, if the CBA were followed, the transitioning teachers could only be placed on, at best, Step 3. But Dr. Kilgore proposed a "one time exception" to the CBA to place the incoming teachers "at Step 3.5 or Step 4" to ensure that "they would be paid no less than what they made last year[.]" The Union accepted this offer, and plaintiffs were each placed on Step 3.5 or Step 4 of the K-12 pay schedule.[1]

While these negotiations were ongoing, the District was faced with a financial deficit. Because of this deficit, the District submitted a Deficit Elimination Plan (DEP) to the State of Michigan that "necessitated a District-wide annual operational expenditure reduction." To accomplish this, the District and the Union executed a memorandum of understanding (MOU) in 2015, in which they agreed to, among other things, freeze teachers' salaries at their current step of the salary schedule. Under the 2015 MOU, newly hired teachers were to be placed on Step 1 "unless otherwise agreed by the parties," and existing teachers were able to "receive Lane/Level increases" if they obtained additional education.

The District eventually terminated its DEP with the state by borrowing $21 million. But, due to this debt, the District and the Union entered into another MOU in 2017, in which they agreed that teachers' salaries would "continue to be frozen at their current step," and that teachers could continue to increase their "Lane/Level" if they obtained additional education.[2] Under the 2017 MOU, the parties agreed that the District would be allowed to place new teachers "not above the third step, except for teaching positions determined by the parties to be difficult to fill," and the District was to provide written notice to the Union for offers "above the third step of the Salary Schedule."

Returning to plaintiffs, although it is not clear what salary plaintiffs earned at Northwestern when they moved to the K-12 pay schedule, plaintiffs testified that they were earning more at Northwestern than they were at Mott. It appears that plaintiffs each had a Bachelor of Arts degree (BA) with 18 additional graduate credits,[3] which would place them in "Lane/Level" "BA+15."

---

[1] Plaintiffs state on appeal that Dr. Kilgore "demanded that [his proposal] be followed," but nothing in the record supports this assertion. Bruce Jordan was part of the Union's negotiations in the matter, and plaintiffs cite to his deposition in support of their assertion. Yet in the cited-to portion of Jordan's deposition, he states that "the union met . . . to review this offer from Kilgore," and they agreed to accept the offer in part because it "show[ed] that [the District] recognize[d] [plaintiffs'] years of service."

[2] Plaintiffs on appeal assert that after the DEP was terminated, their salaries should have been unfrozen. It is unclear why plaintiffs believe that they were not bound by the 2017 MOU.

[3] Burkett testified that she had a BA plus 18 graduate credits. Burkhard initially testified that she had a BA plus 24 graduate credits, but later suggested that she and Burkett had the same level of education. This discrepancy is ultimately not relevant because under the K-12 pay schedule, both a BA plus 18 graduate and a BA plus 24 graduate credits fall under the same level—BA plus 15 graduate credits.

Plaintiffs do not contest their level placement, but instead contend that they should have been placed on a higher step based on their years of service.

Plaintiffs filed this action claiming that the District discriminated against them based on their age, sex, and race in violation of the Elliott-Larsen Civil Rights Act (ELCRA). For Count I, plaintiffs asserted that the District discriminated against them under a disparate-treatment theory because they were paid less than other similarly-situated employees. For Count II, plaintiffs asserted that the District discriminated against them under a disparate-impact theory because both the MOU and the agreement about how to place people transitioning from Mott onto the K-12 pay schedule had a disparate impact on older, white, and female teachers such as plaintiffs. Defendants moved for summary disposition under MCR 2.116(C)(10), and the trial court granted the motion. This appeal followed.

## II. STANDARD OF REVIEW

We review a trial court's ruling on a motion for summary disposition de novo. *Pugno v Blue Harvest Farms LLC*, 326 Mich App 1, 11; 930 NW2d 393 (2018). Summary disposition under MCR 2.116(C)(10) is appropriate where, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." In reviewing the motion, this Court considers the "pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Piccione v Gillette*, 327 Mich App 16, 19; 932 NW2d 197 (2019) (quotation marks and citation omitted). The moving party has the initial burden of production, and may satisfy that burden by either submitting "affirmative evidence that negates an essential element of the nonmoving party's claim," or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996).

> A motion under subrule (C)(10) must specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact. When a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her. [MCR 2.116(G)(4).]

"A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

## III. DISPARATE TREATMENT

Plaintiffs argue that the trial court erred by granting defendants' motion for summary disposition on plaintiffs' claim of disparate-treatment discrimination. We disagree.

The ELCRA provides, in relevant part, that an employer may not "discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of race, color, . . . age, [or] sex . . . ." MCL 37.2202(1)(a). Similarly, an employer may not "[l]imit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of . . . race, color, . . . age, [or] sex . . . ." MCL 37.2202(1)(b).

"Disparate-treatment cases present the most easily understood type of discrimination, and occur where an employer has treated a particular person less favorably than others because of a protected trait." *Ricci v DeStefano*, 557 US 557, 577; 129 S Ct 2658, 2673; 174 L Ed 2d 490 (2009) (quotation marks, citations, and brackets omitted). Proof of a discriminatory intent or motive is required. *Id.* at 578. A plaintiff may establish discriminatory treatment under the ELCRA through direct, indirect, or circumstantial evidence. *Major v Village of Newberry*, 316 Mich App 527, 540; 892 NW2d 402 (2016). Under the ELCRA, "direct evidence" means "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001) (quotation marks and citation omitted).

When no direct evidence of bias can be identified—as is the case here—the plaintiff must "present a rebuttable prima facie case on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful discrimination." *Id.* (quotation marks and citation omitted). To establish a prima facie case of discrimination, plaintiffs must show that (1) they were members of a protected class; (2) they suffered an adverse employment action; (3) they were qualified for the position; and (4) "others, similarly situated and outside of the protected class, were unaffected by [defendants'] adverse conduct."[4] *Town v Mich Bell Tel Co*, 455 Mich 688, 695; 568 NW2d 64 (1997).

Defendants contended in the trial court that plaintiffs' evidence was insufficient to establish the fourth element—that they were treated differently than other similarly-situated individuals. Plaintiffs argued in the trial court that they made less money than other teachers in the District that were on the K-12 pay schedule. In response, defendants argued that the proper group to compare plaintiffs to was other transferred Mott teachers, not teachers that were previously on the K-12 pay schedule. And defendants pointed out that, if that group is considered the proper comparator group, then "Plaintiffs have not identified similarly situated comparators who were treated differently than Plaintiffs[.]"

The trial court agreed with defendants that the proper comparator group was other transferred Mott teachers. The trial court reasoned that (1) Mott and K-12 teachers had different teaching assignments, (2) the teachers were in different locations, and (3) "they had completely different compensation paradigms." For this final reason, the trial court observed that Mott

---

[4] The *Hazle* Court explained that because "the facts will necessarily vary in discrimination cases," the elements of the "prima facie case should be tailored to fit the factual situation at hand." *Hazle*, 464 Mich at 463 n 6.

teachers were paid hourly while K-12 teachers were salaried, and that Mott teachers historically earned less than K-12 teachers. Because plaintiffs did not compare themselves to other transferred Mott teachers, the trial court concluded that plaintiffs failed to establish that they were treated differently from other similarly-situated individuals.

We agree with the trial court's conclusions. The proper comparator group for plaintiffs was other Mott teachers. We find particularly persuasive the fact that Mott teachers were paid in a way that differed significantly from the K-12 teachers; not only were Mott teachers hourly instead of salaried, but their annual pay under the Mott pay schedule was significantly less than K-12 teachers' annual salaries under the K-12 pay schedule. In both the lower court and on appeal, plaintiffs failed to compare themselves to other transferred Mott teachers or argue that they were treated differently than other transferred Mott teachers. Thus, plaintiffs' evidence is insufficient to establish the fourth element of their disparate-treatment claim—that they were treated differently from other similarly-situated individuals. See *Quinto*, 451 Mich at 362; *Town*, 455 Mich at 695. The trial court properly granted summary disposition to defendants.

## IV. DISPARATE IMPACT

Plaintiffs also argue that the trial court erred by granting defendants' motion for summary disposition with respect to plaintiffs' claim of disparate-impact discrimination. We disagree.

To establish a prima facie case of disparate-impact discrimination under the ELCRA, plaintiffs must show that (1) "they are members of a protected class"; and (2) "a facially neutral practice disproportionately impacts or burdens them more harshly than others." *Alspaugh v Comm on Law Enforcement Stds*, 246 Mich App 547, 564; 634 NW2d 161 (2001). Plaintiffs are members of protected classes on the basis of their race, age, and sex. See *id*. Proof of discriminatory motive is not required to prove disparate-impact discrimination. *Dep't of Civil Rights ex rel Peterson v Brighton Area Sch*, 171 Mich App 428, 438; 431 NW2d 65 (1988).

In *Wards Cove Packing Co, Inc v Atonio*, 490 US 642, 647; 109 S Ct 2115; 104 L Ed 2d 733 (1989), superseded by statute on other grounds, 42 USC § 2000e-2(k), the respondents worked as cannery workers at petitioners' canneries. The cannery workers were predominately nonwhite, while "skilled" noncannery workers were predominately white. *Id*. The respondents claimed that petitioners' hiring/promotion practices "were responsible for the racial stratification of the work force." *Id*. at 647-648. The Court of Appeals held that the respondents made out a prima facie case of disparate impact based the "statistics showing a high percentage of nonwhite workers in the cannery jobs and a low percentage of such workers in the noncannery positions." *Id*. at 650. The United States Supreme Court reversed, stating that comparing the number of "skilled" noncannery jobs held by nonwhites "to the number of nonwhites filling cannery worker positions is nonsensical." *Id*. at 651. It explained that "[i]f the absence of minorities holding such skilled positions is due to a dearth of qualified nonwhite applicants (for reasons that are not petitioners' fault), petitioners' selection methods or employment practices cannot be said to have had a 'disparate impact' on nonwhites." *Id*. at 651-652. We agree with the Sixth Circuit that this portion of *Wards Cove* "emphasize[s] the importance of identifying the proper groups for comparison in a disparate impact analysis." *Abbott v Fed Forge, Inc*, 912 F2d 867, 873 (CA 6, 1990).

Plaintiffs argue that the MOU[5] had a disparate impact on older, white, female teachers like plaintiffs,[6] but they do not adequately explain how. Plaintiffs appear to argue that the MOU allowed younger teachers to be *hired* at a higher salary than plaintiffs, but, as defendants point out, plaintiffs were not subject to the MOU's hiring policies. Thus, new hires that were subject to the MOU's hiring polices are not the proper group for comparison. Rather, the proper group for comparison are the other teachers already employed by defendants that became subject to the MOU's terms, like plaintiffs were. The MOU froze everyone's pay, and plaintiffs have not shown that they were disproportionately affected by this pay freeze compared to other teachers whose pay was also frozen. Thus, plaintiffs' evidence is insufficient to establish that the MOU had a disproportionate impact them.

Plaintiffs also argue that the manner in which defendants placed plaintiffs on the K-12 pay schedule disproportionately affected older, white, female teachers like plaintiffs.[7] To establish a disparate-impact claim, plaintiffs must identify a "specific test, requirement, [policy,] or practice . . . that has an adverse impact on" the protected class. *Smith v City of Jackson*, 544 US 228, 229; 125 S Ct 1536; 161 L Ed 2d 410 (2005). We agree with the trial court that defendants' decision about how to transition plaintiffs onto the K-12 pay schedule was not a specific test, requirement, policy, or practice that is subject to a disparate-impact claim. Once Mott closed, defendants had to determine how to transition plaintiffs to the new pay schedule. Defendants made a decision that allowed plaintiffs to continue earning what they did at Mott, but did not make any further adjustment to account for the historical reality of Mott teachers being paid less than K-12 teachers. Defendants' one-time decision about how to transition the Mott teachers was not an employment practice or policy for purposes of a disparate-impact claim. Accord *Texas Dep't of Housing & Community Affairs v Inclusive Communities Project, Inc*, 135 S Ct 2507, 2523; 192 L Ed 2d 514 (2015) ("For instance, a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all.").

Even assuming that the decision about how to transition plaintiffs to the K-12 pay schedule was a "policy" of defendants, plaintiffs cannot establish that it disproportionately impacted or burdened them more harshly than others. In trying to establish their claim, plaintiffs assert that the policy had a disparate impact on them compared to teachers that were already on the K-12 pay

---

[5] Plaintiffs do not state whether they are discussing the 2015 or 2017 MOU, but that omission has no effect on our decision.

[6] Plaintiffs actually only argue in their brief that "Defendants adopted a Memo of Understanding that had a disparate impact on older, more experienced teachers . . . ." We include the other types of discrimination because plaintiffs assert them in reference to this claim in other parts of their brief.

[7] With this claim too, plaintiffs actually only argue that defendants' decision about how to place the transitioning Mott teachers onto the K-12 pay schedule "disproportionally affected the teachers who, like Plaintiffs, are **older** . . . ." But, as before, we include the other types of discrimination because plaintiffs assert them in reference to this claim in other parts of their brief.

schedule. But K-12 teachers who were never on the Mott pay schedule are not the proper comparator group. The proper comparator group for plaintiffs is other transferred Mott teachers who were transitioned from the Mott pay schedule to the K-12 pay schedule. Like with their disparate-treatment claim, plaintiffs do not attempt to compare themselves to other transferred Mott teachers, nor do they argue that they were treated differently than other transferred Mott teachers. Thus, plaintiffs' evidence is insufficient to establish that defendants' decision about how to transition them onto the K-12 pay schedule disproportionately impacted or burdened them more harshly than others.[8]

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kathleen Jansen
/s/ Elizabeth L. Gleicher

---

[8] Plaintiffs also argue that the trial court erred by granting defendants' dispositive motion on plaintiffs' race discrimination claims under both theories (disparate impact and disparate treatment) because defendants treated African-American applicants more favorably. However, as explained, "applicants" are not a proper comparator group for plaintiffs.